IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 8, 2005 Session

## JOHN JAY HOOKER v. SENATOR LAMAR ALEXANDER, ET. AL.

Appeal from the Chancery Court for Davidson County
No. 02-3754-I    Claudia Bonnyman, Chancellor

No. M2003-01141-COA-R3-CV - Filed May 20, 2005

Appellant was an independent candidate for election to the United States Senate in the November 5, 2002, election in which he was defeated by the present incumbent Lamar Alexander. He seeks to have the election declared void on the basis that Alexander used his own money and accepted campaign contribution in support of his candidacy. He alleges that such self financing arrangements and campaign contributions financing violate the qualifications clauses and the equal protection and due process clauses of both the Federal and State Constitutions. Named as defendants were Lamar Alexander, Attorney General Paul Summers and the Lamar Alexander for Senate Committee. All defendants filed Tennessee Rule of Civil Procedure 12.02(6) motions to dismiss, which motions were granted by the trial judge. We affirm the actions of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

John Jay Hooker, Nashville, Tennessee, Pro Se.

Janet Kleinfelter and W. Scott Sims, Nashville, Tennessee, for the appellees, Lamar Alexander, Paul Summers and the Lamar Alexander for Senate Committee.

### OPINION

John Jay Hooker, for 40 years a prominent and colorful veteran of the political wars in Tennessee, continues his crusade against what he considers to be a corrupt system for financing elections in Tennessee. Having himself, at least in 1966 and 1970 when he was a serious and almost successful candidate for governor of Tennessee, committed the same transgressions of which he now complains, he now concludes that he was in error and that both collection of campaign contributions

and use of the candidate's own money in furtherance of a campaign for public office in Tennessee are constitutionally barred.

Mr. Hooker qualified as an independent candidate for the United States Senate subject to the election of November 5, 2002. His complaint is that his opponent, Senator Lamar Alexander, used some $700,000 of his own money as a loan to his campaign and also accepted many thousands of dollars in campaign contributions in furtherance of his campaign. By these actions, he asserts that candidate Alexander violated the Tennessee Constitution and, in particular, Article 1, section 4 along with Articles 1 and 2 of the United States Constitution as well as the Seventeenth Amendment to the United States Constitution. The main thrust of his argument is that such contributions, and the necessity therefore, constitute an additional property qualification, available only to those who have money or can raise money and unavailable to candidates lacking such good fortune. Mr. Hooker asserts that Article IV of the Tennessee Constitution provides that the only qualifications for those seeking public office are citizenship, age and residency. By his reasoning, the need to raise money constitutes an additional qualification in violation of the Tennessee Constitution.

Mr. Hooker frankly states his position in his Complaint and acknowledges the practical impossibility resulting if his position is sustained.

8. Furthermore, this lawsuit complains that Candidate Alexander, in seeking and accepting campaign contributions, violated the federal Constitution, Article I, § 2 and the Seventeenth Amendment. The federal Constitution likewise limits the qualifications for the elected to age, residency and citizenship for United States Senators (see above). When Senator-Elect Alexander solicited and accepted contributions to fund his campaign, he did so in violation of the qualifications clause because the giving and receiving of campaign contributions add a property qualifications to the electoral process which is prohibited under the Tennessee Constitution and under the federal Constitution, Article I, § 3[3] (qualifications clause). However, campaign contributions have become an absolute necessity as it is virtually impossible to be elected without them. Consequently, the dilemma is that campaign contributions are necessary in the election process as it presently exists but they are unconstitutional because they add an additional property qualification in violation of the Tennessee Constitution and in violation of the federal Constitution which requires that members of Congress be elected by "the people" of Tennessee who "elect the most numerous branch of the State Legislature". Campaign contributions are therefore unconstitutional in all state and federal elections.

The facts of the case are not in dispute, as indeed, Senator Alexander used his own money and raised large sums of money by way of campaign contributions in his successful bid for election to the U.S. Senate.

The issues presented by Mr. Hooker for review are:

1.   Are campaign contributions by a voter or non-voter constitutional under the Federal and State Constitutions?

2.   Is there a natural right to give a candidate campaign contributions under the First Amendment?

3.   Are campaign contributions permissible under the Federal Constitution or the Tennessee Constitution?

4.   Is there any First Amendment Right for the candidate to receive campaign contributions, even if the giving of them is permissible under the First Amendment?

5.   Do the states have a Tenth Amendment right to control the election process for Congress, except as to time, place and manner provisions, under Article I, Section 4?

As Mr. Hooker has to acknowledge, there is no provision of either the United States Constitution or the Constitution of Tennessee that addresses (or even mentions) campaign contributions.

The first four of the issues on appeal asserted by Mr. Hooker can be addressed together. They all assert constitutional complaints and will be addressed accordingly. Superimposed upon all these issues is the necessity to determine where the ultimate power to act lies. The ideal place to begin is with that monumental work on Constitutional Limitations by the great Judge Thomas McIntyre Cooley, former Chief Justice of the Supreme Court of Michigan and one of the truly great law writers of history. As he was quoted by the Supreme Court of Tennessee, Judge Cooley says:

> "[T]here was never a written republican constitution which delegated to functionaries all the latent powers which lie dormant in every nation, and are boundless in extent and incapable of definition." Cooley, Const. Lim. p. 37, (175.) . . .
>
> But, "in considering state constitutions, we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. A constitution is not the beginning of a community nor the origin of private rights. It is not the foundation of law, nor the incipient state of government. It is not the cause, but the consequence, of personal and political freedom. It grants no rights to the people, but is the creature of their power, the instrument of their convenience, designed for their

-3-

> protection in the enjoyment of the rights and powers which they possessed before the constitution was made. It is but the frame-work of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought."
> Cooley, Const. Lim. p. 36, (37.)

*Dibrell v. Morris*, 15 S.W. 87, 90 (Tenn. 1891).

The admonition by Judge Cooley that ultimate sovereignty rests with the people is well expressed by Justice Clarence Thomas in his dissenting opinion (speaking for himself along with Chief Justice Rehnquist and Justices O'Connor and Scalia) in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995).

> Our system of government rests on one overriding principle: All power stems from the consent of the people. To phrase the principle in this way, however, is to be imprecise about something important to the notion of "reserved" powers. The ultimate source of the Constitution's authority is the consent of the people of each individual State, not the consent of the undifferentiated people of the Nation as a whole.

> The ratification procedure erected by Article VII makes this point clear. The Constitution took effect once it had been ratified by the people gathered in convention in nine different States. But the Constitution went into effect only "between the States so ratifying the same," Art. VII; it did not bind the people of North Carolina until they had accepted it. In Madison's words, the popular consent upon which the Constitution's authority rests was "given by the people, not as individuals composing one entire nation, but as composing the distinct and independent States to which they respectively belong." The Federalist No. 39, p. 243 (C. Rossiter ed. 1961) (hereinafter The Federalist). Accord, 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 94 (J. Elliot 2d ed. 1876) (hereinafter Elliot) (remarks of James Madison at the Virginia Convention).

> When they adopted the Federal Constitution, of course, the people of each State surrendered some of their authority to the United States (and hence to entities accountable to the people of other States as well as to themselves). They affirmatively deprived their States of certain powers, see *e.g.*, Art. I, § 10, and they affirmatively conferred certain powers upon the Federal Government, see, *e.g.*, Art. I, § 8. Because the people of the several States are the only true source of power, however, the Federal Government enjoys no authority beyond what the Constitution confers: The Federal Government's powers are limited and enumerated. In the words of Justice Black: "The United States is entirely a creature of the Constitution. Its power and authority have no other source." *Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (plurality opinion) (footnote omitted).

In each State, the remainder of the people's powers — "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States," Amdt. 10 — are either delegated to the state government or retained by the people. The Federal Constitution does not specify which of these two possibilities obtains; it is up to the various state constitutions to declare which powers the people of each State have delegated to their state government. As far as the Federal Constitution is concerned, then, the States can exercise all powers that the Constitution does not withhold from them. The Federal Government and the States thus face different default rules: Where the Constitution is silent about the exercise of a particular power — that is, where the Constitution does not speak either expressly or by necessary implication — the Federal Government lacks that power and the States enjoy it.

These basic principles are enshrined in the Tenth Amendment, which declares that all powers neither delegated to the Federal Government nor prohibited to the States "are reserved to the States respectively, or to the people." With this careful last phrase, the Amendment avoids taking any position on the division of power between the state governments and the people of the States: It is up to the people of each State to determine which "reserved" powers their state government may exercise. But the Amendment does make clear that powers reside at the state level except where the Constitution removes them from that level. All powers that the Constitution neither delegates to the Federal Government nor prohibits to the States are controlled by the people of each State.

*Thornton*, 514 U.S. at 846-48 (Thomas, J., dissenting).

While *Thornton* is fascinating, academic reading with Justice Stevens expressing the view of the majority in a lucid and well-reasoned opinion and Justice Thomas, with equal fervor, articulating the views of the minority, the relevancy of the case to the issues at bar is remote. *Thornton* involved an amendment to the Arkansas Constitution, adopted at referendum by the electorate of Arkansas, which sought to limit the terms of public officials in Arkansas including members of the U.S. Senate and U.S. House of Representative. It sought to limit to three terms members of the U.S. House of Representative and to two terms members of the U.S. Senate. The Supreme Court divided on the scope of powers reserved to the states by the Tenth Amendment to the Constitution of the United States. Although there was little disagreement between the members of the court on the general meaning of the Tenth Amendment, the case turned on the finding of the majority that the Tenth Amendment simply did not apply to the case and that the effort by Arkansas to add qualifications to those enumerated in the United States Constitution would not pass constitutional muster. The reasoning of the majority provided, in a nutshell:

In short, as the Framers recognized, electing representatives to the National Legislature was a new right, arising from the Constitution itself. The Tenth Amendment thus provides no basis for concluding that the States possess reserved power to add qualifications to those that are fixed in the Constitution. Instead, any

state power to set the qualifications for membership in Congress must derive not from the reserved powers of state sovereignty, but rather from the delegated powers of national sovereignty. In the absence of any constitutional delegation to the States of power to add qualifications to those enumerated in the Constitution, such a power does not exist.

*Thornton*, 514 U.S. at 805.

If, in fact, Tennessee was attempting to add qualifications to those enumerated in the Constitution of the United States, such effort would doubtless suffer the same fate as happened to Arkansas in Thornton. However, the problem for Mr. Hooker in this case is that nowhere in the Constitution of the United States, the Constitution of Tennessee, or for that matter, any statute is money or property made a condition to running for public office. For reasons stated by Mr. Hooker in his Complaint, a lack of money makes it a practical impossibility for any candidate, particularly one with limited name recognition, to win a statewide election. This self-evident fact of life does not rise to constitutional proportions.

In argument before this Court, Mr. Hooker made three assertions: (1.) *Buckley v. Valeo*, 424 U.S. 1 (1975), relative to campaign financing, should be revisited; (2.) Elections should be publically financed; (3.) We should have a constitutional amendment barring campaign contributions.

The Tennessee judiciary lacks the power, even if it were collectively of such a mind, to accomplish any of these ends. This Court cannot revisit *Buckley v. Valeo*, never having visited it in the first place. The best this Court can do is to provide a conduit under which Mr. Hooker may, if a federal question is properly preserved, ultimately seek relief in the court which pronounced *Buckley v. Valeo*.

Public financing of elections addresses itself to the legislative and executive branches of the Tennessee government. The judiciary cannot amend the Constitution. Whether Mr. Hooker's proposed cures are worse than the disease is a political question which does not address itself to the judiciary.

Judge Cooley cautions us:

"Except when the constitution has imposed limits on the legislative power, it must be considered as practically absolute, whether it act according to natural justice or not, in any particular case. The courts are not the guardians of the rights of the people of the state except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people, in their sovereign capacity, can correct the evil, but courts cannot assume these rights. The judiciary can only arrest the execution of statute when it conflicts with the

constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power. Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being prima facie valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the constitution, and the case shown to come within them. The moment a court ventures to substitute its own judgment for that of the legislature in any case where the constitution has vested the legislature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority, and where its discretion alone will measure the extent of its interference." Cooley, Const. Lim. (6th Ed.) 200, 201.

*State v. Henley*, 41 S.W. 352, 354-55 (Tenn.1897).

No matter what the legislature might be able to do with the contribution side of the ledger, as long as *Buckley v. Valeo* stands, the First Amendment to the U.S. Constitution is a bar to restrictions on campaign expenditures.

The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government, but the people — individually as citizens and candidates and collectively as associations and political committees — who must retain control over the quantity and range of debate on public issues in a political campaign.

*Buckley v. Valeo*, 424 U.S. 1, 57 (1975).

The zeal of Mr. Hooker's crusade cannot vest the judiciary with powers that are essentially legislative in character. He simply cannot get there from here.

The judgment of the trial court is in all respects affirmed. Costs of appeal are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE